IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 9, 2014

### ALVIN MICHAEL YOUNG v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Sullivan County**
**No. C62540     Robert H. Montgomery, Judge**

_____

**No. E2014-01276-CCA-R3-PC - Filed April 7, 2015**

_____

The *pro se* petitioner, Alvin Michael Young, appeals the post-conviction court's denial of his petition for post-conviction relief from his convictions for aggravated kidnapping and domestic assault. On appeal, he argues that he received the ineffective assistance of counsel on appeal. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Alvin Michael Young, Mountain City, Tennessee, Pro Se (on appeal); Jim R. Williams, Kingsport, Tennessee (at hearing), for the Defendant-Appellant, Alvin Michael Young.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Barry Staubus, District Attorney General; and William Harper, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted by a Sullivan County jury of aggravated kidnapping and domestic assault. The trial court merged the petitioner's convictions and sentenced him to eight years and six months in the Tennessee Department of Correction. The petitioner appealed, arguing that the evidence was insufficient to support his aggravated kidnapping conviction and that he received the ineffective assistance of counsel at trial. After review, this court affirmed the trial court's judgment. See State v. Michael Alvin Young, No. E2010-00849-CCA-R3-CD, 2011 WL 5517281 (Tenn. Crim. App. Nov. 9, 2011). The petitioner

filed a Rule 11 application, pursuant to the Tennessee Rules of Appellate Procedure, to the Tennessee Supreme Court. Our Supreme Court granted the application and remanded the case to this court for reconsideration in light of State v. White, 362 S.W.3d 559 (Tenn. 2012), a case in which the supreme court announced that

> trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony. Instructions should be designed to effectuate the intent of the General Assembly to criminalize only those instances in which the removal or confinement of a victim is independently significant from an accompanying felony, such as rape or robbery. When jurors are called upon to determine whether the State has proven beyond a reasonable doubt the elements of kidnapping, aggravated kidnapping, or especially aggravated kidnapping, trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction. In our view, an instruction of this nature is necessary in order to assure that juries properly afford constitutional due process protections to those on trial for kidnapping and an accompanying felony.

Id. at 578. After considering the facts and circumstances of the petitioner's case as compared to those in White, this court again affirmed the trial court's judgment, and the Tennessee Supreme Court denied his application for permission to appeal.

On the petitioner's second direct appeal, this court summarized the underlying facts and procedural history of the case as follows:

> This case arises from the [petitioner]'s kidnapping and assault of his girlfriend on July 29, 2006. Based on these events, a Sullivan County grand jury indicted the [petitioner] for aggravated kidnapping, domestic assault, two counts of reckless aggravated assault, and reckless endangerment.

> **A. Trial**

> At the [petitioner]'s trial, the parties presented the following evidence: Lindsey Bishop, the victim's friend, testified that she, the victim, and another friend, Madison Hill, went to "Club Up" at around midnight. Bishop recalled that she drank three beers that night and that she also observed the victim drinking alcohol. Bishop said that the three women were out on the dance

floor when the [petitioner] approached the victim from behind and grabbed the victim's hair so forcefully that it lifted her off the floor. The [petitioner] then pulled the victim to the side of the dance floor where the victim hit her head on a pole. Bishop described the victim as "upset," "hurt," and "crying." When Bishop approached the arguing couple, the victim did not acknowledge her, so Bishop left to pay her bill. When she returned to where the [petitioner] and the victim had been arguing, they were gone.

Bishop testified that, as she exited Club Up, she heard screaming. Bishop ran toward the screaming and saw that the victim was partially in a car by which Hill was also standing. The [petitioner] pushed Hill down and then picked up the victim's legs, put them inside the car, and closed the car door. Bishop said that she opened the passenger side door of the car to check on the victim, who had lost her shoes in the struggle and was crying with her head in her hands. Before Bishop could speak with the victim, the [petitioner] started the car and drove it in reverse, causing the car door to knock Bishop over, and then sped away. Bishop said that she sustained bruises and scratches from being knocked to the ground by the car door. Bishop said that later, at the police station, she gave a statement about these events to the police.

On cross examination, Bishop agreed that, while she was present during the altercation between the victim and the [petitioner], the victim never indicated she wanted to leave the club with Bishop.

The victim testified that, at the time of this incident, she lived with the [petitioner]. The victim said that on the night of July 29, 2006, she arranged to go out with some friends and to meet up with the [petitioner] later that night at Club Up. The victim rode to Club Up with Bishop, and, when they arrived, they drank and talked with friends. The victim admitted drinking that night and, although she did not recall how many drinks, she agreed that she was "intoxicated." When asked to describe her contact with the [petitioner] that night, the victim said the following:

> The only thing that I really remember is I believe maybe [Hill]
> or [Bishop] and I were going to the dance floor to dance and I
> had saw him sitting at the bar and [Hill] and I went to say hi or
> whatever and then after that I don't really recall anything.

The victim further explained that she "bruise[d] very easily so [she] always [had] bruises." The State then showed the victim photographs taken

the morning of this incident, and she identified a knot on her head in one of the photographs. The victim testified that she did not have that knot on her head before she went to Club Up that night.

On cross-examination, the victim testified that she did not know how she got the knot on her head. The victim confirmed that she remembered speaking with the [petitioner] at the bar and the next thing she remembered was a police officer pulling them over for speeding. The victim said that she spoke with the police officer, outside the [petitioner]'s presence, and that she never told the police officer that she was in trouble or needed assistance. The police officer then released the [petitioner] and victim, and they went to their apartment. At some point, the victim wanted cigarettes, so the [petitioner] drove the victim to a store where police officers asked the [petitioner] and victim to go to the Kingsport Police Department. The victim agreed that she and the [petitioner] "voluntarily" went to the police station.

Madison Hill testified that she knew the victim because the two worked together at Cheddar's restaurant. Hill said that on the night of July 29, 2006, she went to Club Up with the victim and Bishop. While out on the dance floor, the [petitioner] approached the victim, grabbed her by the hair, and in the course of doing so knocked the victim's head against Hill's head. Hill said she then watched as the [petitioner] "push[ed], shov[ed], and dr[u]g" the victim outside. The victim fought against the [petitioner], kicking and screaming. Hill followed the [petitioner] and victim out into the parking lot where the [petitioner] carried the victim over his shoulder and then put her into his car. The victim tried to get out of the car, and Hill attempted to help her. After trying unsuccessfully to get the victim out of the car, Hill went to the back of the car to get the license plate number. While she was doing so, the [petitioner] backed up and hit Hill, knocking her down and scraping her right knee. On cross-examination, Hill admitted that she had been drinking that night and agreed she was "[v]ery" intoxicated. Hill clarified that she did not think the [petitioner] hit her with the car intentionally. She further explained that the reason she tried to get the license plate number and help the victim out of the car was because she believed the victim needed "protection and help." Hill said that the victim, "didn't want to leave."

Matthew Smith testified that he drove to Club Up on the night of July 29, 2006, to give Bishop a ride home. When he arrived, Smith observed the [petitioner] dragging the victim down the sidewalk while the victim screamed, "Help me, help me, please somebody help me." Smith watched as the

-4-

[petitioner] put the victim in a car and "quickly" drove off.

Officer Penny Makowski, a Kingsport Police Department officer, testified that she interviewed Madison Hill, Lindsey Bishop and Corrine Roebuck, each of whom witnessed these events. Officer Makowski said that she also interviewed the victim, who she described as "very upset, crying, injured, [and] scared" during the course of the interview.

Based upon this evidence, a jury convicted the [petitioner] of aggravated kidnapping and domestic abuse. The trial court merged the two convictions and ordered the [petitioner] to serve eight years and six months in the Tennessee Department of Correction.

## B. Hearing on Motion for New Trial

After the trial, but before the sentencing hearing, the trial court appointed a new attorney (hereinafter referred to as "Appellate Counsel") for the [petitioner]. Appellate Counsel filed the motion for new trial, which included claims that the [petitioner]'s trial counsel (hereinafter referred to as "Counsel") was ineffective. The trial court held four hearings on the [petitioner]'s motion for a new trial. At the first hearing date, on November 4, 2010, the [petitioner] told the trial court that he was unhappy with Appellate Counsel. Upon questioning, the trial court reset the hearing date to provide Appellate Counsel and the [petitioner] an opportunity to resolve the [petitioner]'s concerns about his representation.

### 1. Motion for New Trial Hearing – November 30, 2009

At the second hearing on the [petitioner]'s motion for a new trial, the [petitioner] testified about an alleged conflict that he believed prevented Counsel from representing him at trial. The [petitioner] said that, initially, a general sessions judge appointed an attorney from the public defender's office to his case. The [petitioner] agreed that this attorney withdrew from the case. He explained that the public defender wanted him to waive the preliminary hearing, and he disagreed. The public defender told him to go back to his holding cell and then returned "five minutes later saying that [the petitioner had] called her a name or whatever." The [petitioner] said that "then she just left," and the general sessions court judge appointed a private attorney to represent him.

The [petitioner] testified that, after the case was sent to criminal court, the trial court, because the [petitioner] was once again no longer represented, appointed Counsel, a public defender, to represent him. At the time of Counsel's appointment, Counsel stated to the trial court that he "may have a conflict with representing" the [petitioner]. The [petitioner] explained that, at the time, he did not understand the meaning of "conflict of interest," and the issue was never raised or discussed again.

Counsel also testified at this hearing, agreeing that the trial court appointed him to represent the [petitioner]. Counsel said he was unaware that the [petitioner] allegedly called the first public defender appointed to represent him an insulting name. Counsel said that neither the public defender nor the [petitioner] ever mentioned the name-calling incident. Upon questioning by the trial court, Counsel said, "I have no recollection of there being a conflict at all and if there was something brought to my attention that someone else was assigned this case, a private attorney, then usually I would make inquiry as to the support staff to check." Counsel went on to explain that, even had he been told that the [petitioner] called another public defender in his office a name, such an incident was not something he believed would prevent the public defender's office from handling the case. When asked whether he remembered making a statement to the trial court about a conflict with the [petitioner]'s case, Counsel responded, "I do not recall that. That doesn't mean it didn't happen. I mean if I said it in open court it will be on the record but I do not recall that at all." After this evidence was presented, the trial court set another date upon which to resume the hearing.

**Motion for New Trial Hearing – March 15, 2010**

At the next hearing, the [petitioner] offered the testimony of Crystal Heishman, the Washington County Sheriff's Department officer who stopped the [petitioner] for speeding while he was driving the victim away from Club Up. Officer Heishman testified that, on the night of July 29, 2006, she conducted a traffic stop involving the [petitioner] as the driver of the vehicle. Officer Heishman said that she was summoned to court for the [petitioner]'s original trial date, and she brought with her the video recording of the traffic stop. She showed the video recording to both the State and Counsel. Counsel ultimately did not call Heishman to testify at trial. Officer Heishman speculated that Counsel did not call her to testify in part because she believed the victim lied to her during the traffic stop. During the stop, when Officer Heishman approached the vehicle to speak with the [petitioner], she observed

the victim with "tears running down her face" and "blood on her arm." The [petitioner] denied that he assaulted the victim, and, when Heishman separated the victim from the [petitioner] to give her an opportunity to tell the officer the truth, the victim maintained that the [petitioner] did not hurt her. The victim explained that she received the injuries during a fight at a club with another female. Officer Heishman had "no reason to doubt her," so she released the [petitioner] and the victim after she gave the [petitioner] a traffic citation.

Whitney Taylor, an attorney in Kingsport, Tennessee, testified that he represented the [petitioner] on charges unrelated to the present case. Taylor recalled a meeting where Counsel, the [petitioner], and he met to discuss a possible plea negotiation for all of the [petitioner]'s charges in this case and the charges for which Taylor represented the [petitioner]. Taylor said Counsel reviewed the [petitioner]'s charges with him and the possible punishments. Taylor said that Counsel did a "very thorough job" in reviewing the case with the [petitioner].

The [petitioner] testified that Counsel was ineffective for failing to call Officer Heishman and present the video recording of the traffic stop. The [petitioner] complained that Counsel had mentioned the officer as a witness in opening argument and should not have done so if he did not intend to call the officer to testify. The [petitioner] said that Counsel never discussed with him the content of Officer Heishman's testimony or the decision whether to call her. The [petitioner] said that the video recording of the traffic stop would have refuted the State's evidence that the [petitioner] kidnapped the victim because the video showed the victim freely exiting the vehicle two times during the course of the video recording.

The [petitioner] said that, after Officer Heishman released them, he drove to their apartment. Shortly thereafter, the victim wanted cigarettes, so the [petitioner] drove her to the store. Upon arriving at the store, a police officer approached the [petitioner] and requested the [petitioner]'s identification. The officer then asked the victim if she was okay, and she replied that she was okay. The officer returned to his vehicle to check the [petitioner]'s identification, and, when he returned, he told the [petitioner] about the allegations of kidnapping. The [petitioner] testified that the victim told the officer that the [petitioner] had not kidnapped her. The officer then asked if they would be willing to follow him to the police station to "straighten this out." The [petitioner] agreed, and he drove the victim to the police station. The [petitioner] testified that he and the victim were separated, and, a short

time later, an officer took the [petitioner] to booking on charges of domestic assault. The [petitioner] explained that Counsel should have used this information to show that the victim was not kidnapped because police allowed her to stay in the vehicle with the [petitioner] while he willingly drove to the police station. The [petitioner] agreed that Counsel asked the victim on cross-examination if she willingly went to the police station, but he maintained that Counsel should have "[brought] it out properly" and called the officers involved to testify.

The [petitioner] testified that Counsel was ineffective for failing to file a motion to suppress Bishop's and Hill's statements to the police because they were intoxicated at the time they provided the statements. The [petitioner] said that he never asked Counsel to file a suppression motion, but he did inform Counsel that both witnesses were intoxicated the night of the incident. Upon questioning by the trial court, the [petitioner] agreed that the witnesses' statements were not introduced at trial. Further, the [petitioner] agreed that Counsel cross-examined both witnesses on the issue of intoxication. The [petitioner] clarified that he believed that neither witness should have been allowed to testify at all because they were intoxicated the night of the incident. Specific only to Hill's testimony, the [petitioner] claimed that Counsel failed to present to the jury that Hill was under the age of twenty-one at the time she drank alcohol. In explaining this issue, the [petitioner] said, "I mean how was she able to testify to anything when I mean she wasn't even of age to even been drinking in the club that night. Actually she should have been in jail with me, to be honest."

The [petitioner] testified that Counsel failed to "effectively" cross-examine Officer Makowski. Officer Makowski testified at trial that Hill had been drinking but that she did not believe Hill to be so impaired that she could not give a statement. The [petitioner] argues that this statement directly conflicts with Hill's statement that she was "very much so intoxicated," and Counsel should have cross-examined Officer Makowski on these conflicting statements.

The [petitioner] claimed that Counsel was ineffective for failing to interview the victim. Although the [petitioner] never discussed this with Counsel, the [petitioner] testified that interviewing the victim should have been obvious to Counsel. The [petitioner] testified that he was still in contact with the victim at the time of trial and rode to the courthouse with her on the day of his trial. The [petitioner] said that he did not know if Counsel was

aware of the [petitioner]'s continued contact with the victim. The [petitioner] said that the victim gave a victim impact statement for the presentence report wherein she said that the [petitioner] did not kidnap her. The [petitioner] testified that the trial court should consider the victim impact statement as newly discovered evidence because the victim never gave a statement prior to the [petitioner]'s trial.

Finally, the [petitioner] testified that Counsel failed to discuss potential strategies and tactical choices with him. As an example, the [petitioner] referred to Counsel's decision not to call Officer Heishman to testify. The [petitioner] said that Counsel discussed the possible plea agreement with him, but Counsel did not discuss trial strategies.

At this point, the [petitioner] requested that he be allowed to make an offer of proof as to what his testimony would have been at trial. The State objected to the [petitioner]'s making an offer of proof because the State was not prepared to cross-examine the [petitioner] two years after trial without notice, and the State contended that the [petitioner] would now benefit from hindsight. The trial court reset the hearing to give the attorneys an opportunity to prepare for the offer of proof.

### 3. Motion for a New Trial Hearing – March 22, 2010

The trial court allowed the [petitioner] to make an offer of proof as to his testimony had he elected to testify at trial. The [petitioner] made the following offer of proof as to the events of July 29: The [petitioner] testified that he and the victim lived together, and the victim wanted to go to Club Up with Bishop and Hill. The [petitioner] said that he was not angry with the victim for going but that the victim's mother had advised the victim not to go, and the [petitioner] had a "bad feeling" about her going. The [petitioner] said that he too advised the victim not to go but that ultimately he "let her go out." The [petitioner] had other plans for the evening, which were later cancelled, so he called the victim and told her he would join her at Club Up.

The [petitioner] testified that he had been at the club probably 45 minutes to an hour when the altercation between he and the victim occurred. The [petitioner] said that as the victim and Hill walked out onto the dance floor they were "trying to hold each other up," and the victim was about to fall due to the level of their intoxication. The [petitioner] admitted that he was "kind of angry" as he made his way out on to the dance floor that the victim was "not

handling herself properly." The [petitioner] said that he approached the victim from behind and grabbed her hair, which caused the victim to lose her footing and fall. The [petitioner] said that he reached down and picked the victim up but that she "jerked away" from him. At this point, a female unknown to the [petitioner] approached and began yelling and cursing at the [petitioner]. A bouncer for the club then approached and asked the [petitioner] if he needed any help. The [petitioner] explained to the bouncer that his girlfriend was intoxicated and, because of another unrelated altercation in the club, the [petitioner] wanted to get her out of the club "before anything happens." While the [petitioner] was speaking with the bouncer, he lost sight of the victim but later found her leaning against the rail at the edge of the dance floor with another girl unknown to the [petitioner]. This girl was yelling and cursing at the victim, but there was no physical contact between the two women. The [petitioner] said that he stepped in between the victim and this unknown girl and moved the victim "to the side." The [petitioner] tried to calm the victim and explained to her that there was an altercation in the club and that they needed to leave. The victim agreed, and the two left the club.

The [petitioner] testified that, as they walked down the steps to get out of the club, Hill approached, yelling to the victim not to leave with the [petitioner]. The victim, wearing high heels, lost her footing on the stairs and fell down. The [petitioner] said that he grabbed the victim's arm, and the victim kicked off her shoes. The victim then started "go[ing] off" on the [petitioner] telling him that she could, "walk by [her]self." The [petitioner] described the victim as "screaming" and "flailing." The [petitioner] testified that he again attempted to calm the victim as they proceeded toward the car. Hill began screaming for help and grabbed the victim's arm. The victim pushed Hill back, knocking Hill down onto the ground. The [petitioner] said that they passed people as they went out to the car but that he did not know any of those people.

The [petitioner] testified that when they finally reached the car, Hill was still yelling, so the [petitioner] suggested that Hill ride with them. Hill ran to a nearby truck and asked the driver to call the police. The [petitioner] also approached the truck and explained that Hill was drunk and asked the driver if he knew Hill and could help the [petitioner]. The driver never responded and Hill ran back to the car and tried to get the victim out. The [petitioner] again assured Hill that the victim was fine and offered to give Hill a ride home. The [petitioner] said that Hill would not listen to him, so he got into the car and put the car in reverse. At this point, Bishop appeared and tried to open the

passenger side door as the [petitioner] was reversing the car. The [petitioner] said that he stopped the car, and he told the victim to shut the car door, during which time, Bishop and Hill yelled and banged on the car windows instructing the victim to "get out of the car."

The [petitioner] explained that the victim had ample opportunity to get out of the car had she wanted to do so. The [petitioner] said that the victim was alone in the car while he approached the man in the truck approximately thirty feet away. The [petitioner] denied forcing the victim to leave the club or get into the car with him.

The [petitioner] testified that, on their way home, Officer Heishman pulled their car over. After this traffic stop, they continued to their apartment, which was two or three minutes from where the officer pulled them over. The [petitioner] said that when he pulled into the driveway, the victim indicated that she wanted cigarettes, so he drove her to the store. On their way to the store, he noticed two Kingsport police cars driving fast. A third police car behind the first two police cars slowed and followed the [petitioner] into the store parking lot. An officer approached the car and asked for the [petitioner]'s identification. The [petitioner] provided his driver's license, and the officer returned to his car and talked with officers from three other police vehicles that had also arrived at the store. The [petitioner] testified that when the officer returned, he told the [petitioner] that someone reported that the [petitioner] kidnapped the victim. The [petitioner] also testified that the victim told the police officer, "[The petitioner] did not kidnap me." The officer looked at the [petitioner] and victim, shrugged his shoulders, and asked if the [petitioner] would drive to the police station "to straighten this out." The [petitioner] agreed and followed the officer to the police station where he and the victim were separated. An officer retrieved the [petitioner] "three minutes later" and took the [petitioner] to booking. The [petitioner] asked why he was being arrested and the officer said for "domestic violence." The [petitioner] testified that he "accepted that" because he had pulled the victim's hair, but the next morning he learned that he was charged with kidnapping and "all the other stuff."

When asked about Officer Heishman's description of the victim during the traffic stop as "crying and bleeding," the [petitioner] denied any knowledge of blood on the victim. As to the victim's crying, he explained that the victim had fallen asleep during the drive and he woke her when the officer pulled them over. The [petitioner] "guess[ed]" the victim began crying when he

-11-

woke her because she was worried that the [petitioner] might get in trouble due to her friend's threats at the club to call police.

The [petitioner] testified that he never gave Counsel a list of potential witnesses but that he told Counsel "about the bouncers and everything." The [petitioner] agreed that, although Counsel did not ask Hill about her age, he did ask another witness about the fact that Hill was underage and drinking the night of this incident.

Counsel testified that the [petitioner] was indicted on five charges, but the jury convicted the [petitioner] of only two of those charges. Counsel said that he interviewed the victim's mother, but he did not believe she could contribute anything to the evidence because she was not present. Counsel said that he believed he also spoke with the victim either on the phone or in person because he knew that the victim was "pleading amnesia."

Counsel testified that he made the decision to not call Officer Heishman. He maintained, however, that he explained the decision to the [petitioner] before releasing Officer Heishman from the subpoena, and the [petitioner] agreed. Counsel recalled that he spoke with Officer Heishman numerous times before trial, and it became "abundantly clear" that Officer Heishman was "embarrassed by the fact that she felt, rightly or wrongly, . . . that she had been somehow lied to at the stop." Officer Heishman made clear to Counsel that she wanted to let the jury know that she made a mistake by letting the [petitioner] go that night. Further, the video recording showed Officer Heishman asking the victim why she was crying, and the [petitioner] interjected before the victim could answer, offering that the victim was involved in an altercation with another female. Counsel believed this to be inconsistent with the trial testimony. Counsel explained that he did not want to provide the jury with evidence that raised the inference that the victim and the [petitioner] may have created a "cover-up story."

Counsel testified that he met with the [petitioner] at each of the court hearings and on at least on three additional occasions. One of the meetings was at Taylor's office to discuss a settlement. After reviewing the charges and potential punishments with the [petitioner], Counsel negotiated a favorable plea with the State. The [petitioner] indicated he would accept the offer but wanted to first discuss the offer with his grandmother. Then, he would let Counsel and Taylor know his final decision. Counsel said he did not hear from the [petitioner] for a month but recalled that he unsuccessfully attempted to

-12-

contact the [petitioner]; although, he made no notes indicating the attempted contact. The next contact Counsel had with the [petitioner] was the day of trial, and the [petitioner] told Counsel he would not accept the plea offer.

In reference to the [petitioner]'s complaint that Counsel failed to suppress the statements of Hill and Bishop, Counsel said that the statements never came in at trial. Counsel recalled that Hill's and Bishop's testimony at trial was detrimental to the State's case in that they both freely admitted they were drinking and intoxicated the night of these incidents. Counsel testified that he reviewed the case with the [petitioner]. Counsel did not recall the [petitioner] providing the names of any specific witnesses other than Officer Heishman.

On cross-examination, Counsel acknowledged that he did not have a "rock solid recollection of sitting down with [the victim]," but he knew she claimed amnesia. Counsel said that he positively "sat down" with the victim's mother. Counsel testified that he did not review the police videotape of Officer Heishman's traffic stop with the [petitioner] because he did not have access to the video for very long.

Counsel agreed that he mentioned Officer Heishman in opening argument. Counsel explained that, at that time, he believed the victim was going to testify that she did not remember anything, so he thought the only way to get the traffic stop before the jury was Officer Heishman's testimony. Once on the stand, however, the victim testified about the relevant portions of the traffic stop. Counsel said that he then decided not to call Officer Heishman because he believed the victim's testimony was "better."

Counsel testified about the decision to not call the Kingsport police officers as witnesses at trial. He said that it is a "very, very dicey prospect to place arresting officers on the stand as your witness." The potential for damage to the [petitioner]'s case on the State's cross-examination is great, and he wanted to prevent that opportunity for the State. Counsel did not recall the [petitioner] requesting that Counsel subpoena the Kingsport officers.

Appellate Counsel called the [petitioner] as a rebuttal witness. The [petitioner] testified that he did tell Counsel that he wanted the Kingsport officers present during his trial. The [petitioner] agreed that he did not provide the officers' names to Counsel, but he believed they were in the police report. The [petitioner] said that "we" tried to get the Kingsport officers "to come to

-13-

this hearing but for some reason nobody knows who they are."

Based upon this evidence, the trial court denied the [petitioner]'s motion for a new trial.

State v. Michael Alvin Young, No. E2012-00726-CCA-RM-CD, 2012 WL 2465156, at *2-10 (Tenn. Crim. App. June 28, 2012), perm. app. denied (Tenn. Nov. 21, 2012).

On July 16, 2013, the petitioner filed a petition for post-conviction relief in which he argued, relevant to this appeal, that appellate counsel was ineffective because he failed to raise as issues: that more than forty-five days passed between the jury's verdict and sentencing hearing and challenge the length of sentence imposed, and that the trial court erred in merging his convictions for domestic assault and aggravated kidnapping.

The trial court conducted an evidentiary hearing, at which the petitioner testified that appellate counsel failed to raise as an issue in his motion for new trial that more than forty-five days passed between the jury's verdict and the sentencing hearing. He said that he was convicted on August 5, 2008, but his sentencing hearing was not conducted until March 6, 2009, and he did not waive the forty-five-day requirement. The petitioner stated that he had another case pending a plea agreement, and he wanted to wait to sign the agreement until the sentencing hearing transpired in this case. He claimed, however, that he was told that he would be forced to go to trial if he did not sign the plea bargain. The petitioner stated that he asked appellate counsel to raise the untimely sentencing hearing as an issue on appeal, but appellate counsel told him that doing so "would be pointless." The petitioner contended that the delay allowed the State to use the guilty plea conviction to "enhance" his sentence in the present case. He asserted that, without the intervening guilty plea, he would have received a sentence of eight years, the minimum in his range, rather than an eight-and-one-half-year sentence. He also claimed that he was denied the right to "at least be[] considered" for sentencing as an especially mitigated offender.

The petitioner testified that appellate counsel also failed to raise on appeal the issue of the merger of his convictions for domestic assault and aggravated kidnapping. He claimed that the convictions were "separate and distinct" and that domestic assault is not a lesser included offense of aggravated kidnapping. He believed that the aggravated kidnapping conviction would have been overturned had the convictions not been merged because "the appellate court . . . ruled since the charges were merged that double jeopardy did not . . . attach to [his] case." The petitioner discussed the issue with appellate counsel and believed that he was going to include it in his brief.

-14-

On cross-examination, the petitioner agreed that appellate counsel advised him against raising ineffective assistance of counsel in his motion for new trial, and his persistence in pursuing the issue led to multiple delays in the motion for new trial hearing. The petitioner agreed that the delay in his sentencing hearing was partly the result of his obtaining new counsel after he was unable to "get along with" trial counsel. The petitioner asserted that he would have preferred that his domestic assault and aggravated kidnapping convictions to have not been merged because "if it's a double jeopardy issue it doesn't exist if the charges [were] merged together." He admitted that counsel raised the issue but said that counsel did not present it correctly on appeal.

Appellate counsel testified that he was appointed to represent the petitioner after the trial, but before the sentencing hearing or motion for new trial. The petitioner insisted on raising the issue of ineffective assistance of counsel in the motion for new trial, despite appellate counsel's recommendation not to do so. Appellate counsel recalled that there was "a pretty large period of time" after the petitioner was convicted before counsel was appointed, so the trial court "allow[ed] [him] pretty much leeway to have time to familiarize [him]self with the case before [they] went ahead with sentencing." In response to the petitioner's assertion that he was denied the possibility of being sentenced as an especially mitigated offender due to the delay, counsel stated that it is very rare for an offender to be sentenced as such and he "would be extremely surprised . . . that that ever happened in a crime involving an issue of violence." As to why he did not challenge the petitioner's overall sentence on appeal, appellate counsel noted that trial courts are given broad discretion in sentencing in state court and that the trial court "had solidified the record to the point where that argument would be useless."

With regard to the petitioner's allegation concerning the merger of his offenses, appellate counsel testified that he and the petitioner talked about the issue "several times and [he] felt . . . that [he] had argued the issue as [the petitioner] wanted it argued" within the bounds of "the state of the law [as it] was at that time." Appellate counsel said that the petitioner referred to the issue as "merger," but that was perhaps not the proper legal term for the situation. He summarized that his argument on appeal was essentially that the petitioner "shouldn't have been able to been convicted of both the assault and the kidnapping" because the kidnapping was incidental to the domestic assault. The Tennessee Supreme Court granted the petitioner's application for permission to appeal and remanded the case for reconsideration under White, a recently issued opinion requiring trial courts to give a jury instruction on determining whether kidnapping was merely incidental to an accompanying offense. However, on remand, the Court of Criminal Appeals determined that the kidnapping was not incidental to the domestic assault, but a separate offense.

-15-

After the hearing, the post-conviction court made oral findings followed by a written order denying relief. The court determined that none of the evidence presented by the petitioner demonstrated that appellate counsel's performance fell below an objective standard of reasonableness.

## ANALYSIS

The petitioner argues that he received ineffective assistance from appellate counsel because counsel: (1) failed to argue that his sentencing hearing was untimely and challenge the length of sentence imposed; and (2) failed to argue in his appellate brief that the trial court erred by merging his domestic assault conviction into his aggravated kidnapping conviction.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo,* with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687(1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

-16-

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

With regard to the petitioner's argument that appellate counsel was ineffective because he failed to argue that the petitioner's sentencing hearing was untimely and challenge the length of sentence imposed, the petitioner asserts that as a result of the delay, he was forced to plead to another offense and that conviction, in turn, was used to enhance his sentence for aggravated kidnapping. The testimony at the evidentiary hearing indicated that the delay in the sentencing hearing was the result of the petitioner's obtaining new counsel after he was unable to "get along with" trial counsel and appellate counsel's being given time to familiarize himself with the petitioner's case. Appellate counsel indicated that he did not believe that the delay affected the outcome of the petitioner's sentencing hearing in any way, and he noted that the petitioner had almost no chance of being sentenced as an especially mitigated offender regardless of the timing of the sentencing hearing. As to his not challenging the overall length of the petitioner's sentence, appellate counsel noted that trial courts are given broad discretion in sentencing in state court and that the trial court "had solidified the record to the point where that argument would be useless."

In ruling on this issue, the post-conviction court accredited appellate counsel's testimony that "there was no basis to raise as an appellate issue the delay of more than 45 days of the sentencing, or the . . . fa[c]t that [the] petitioner was not sentenced as a mitigated

offender." The court determined that raising the timeliness of the sentencing hearing or the petitioner's overall sentence as issues on appeal would have been "frivolous." The record supports the post-conviction court's determination that the petitioner failed to prove that appellate counsel rendered deficient performance or that "he was prejudiced by any delay much less how it would have had any impact on appeal."

With regard to the merger issue, we agree with appellate counsel's analysis that the petitioner's reference to the issue as "merger" is perhaps not the proper legal term for the situation. The petitioner asserts that appellate counsel should have contested the merger of his two offenses on appeal because the offenses were not "separate and distinct" and the aggravated kidnapping was really a false imprisonment. Thus, although inartfully worded, it appears that the petitioner is aggrieved that he was prevented from raising a double jeopardy claim due to the merger by the trial court and believes that the aggravated kidnapping conviction would have been overturned on appeal had the convictions not been merged.

At the evidentiary hearing, appellate counsel testified that he and the petitioner talked about the issue "several times and [he] felt . . . that [he] had argued the issue as [the petitioner] wanted it argued" within the bounds of "the state of the law [as it] was at that time." Appellate counsel summarized that his argument on appeal was essentially that the petitioner "shouldn't have been able to been convicted of both the assault and the kidnapping" because the kidnapping was incidental to the domestic assault.

As to this issue, the post-conviction court found that appellate counsel raised a double jeopardy issue on appeal, and the appellate court determined that there "was not a double jeopardy issue as the trial court merged the domestic assault conviction with the aggravated kidnapping conviction." The post-conviction court noted that appellate counsel then "raised in his discretionary appeal request to the Tennessee Supreme Court that the trial court's instructions with regard to whether the aggravated kidnapping was incidental to the domestic assault did not comply with State v. White[.]" The Tennessee Supreme Court granted the petitioner's application for permission to appeal and remanded the case for reconsideration under White, a recently issued opinion requiring trial courts to give a jury instruction on determining whether kidnapping was merely incidental to an accompanying offense. On remand, the Court of Criminal Appeals determined that the kidnapping was not incidental to the domestic assault, but a separate offense, and despite the trial court's not providing the jury with instructions as detailed in White, the evidence was legally sufficient to sustain both of the petitioner's convictions. See Michael Alvin Young, 2012 WL 2465156, at *11-13. The Tennessee Supreme Court later clarified that the failure to give a jury instruction as contemplated by White was harmless beyond a reasonable doubt.

-18-

Therefore, the record supports the post-conviction court's determination that "the petitioner has failed to show by clear and convincing evidence that [appellate counsel's] performance as petitioner's appellate attorney was deficient." Moreover, the essence of the petitioner's "merger" issue was raised and addressed on appeal; thus, he has not shown any prejudice.

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that the petitioner has not met his burden of showing that he was denied the effective assistance of counsel. Accordingly, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE